## GUARANTEEING FINANCIAL RESPONSIBILITY.

Common Pleas Court of Cuyahoga County.

THE CLEVELAND BUILDERS SUPPLY COMPANY v. THE CITY IN-
VESTMENT COMPANY.

Decided, May 28, 1913.

*Building Contracts—Power of a Corporation to Guarantee Payment for Material Going Into Its Building—Guarantee Validated by Signature of Secretary, When—Guarantee and Warranty Distinguished.*

1. Where a corporation, engaged in erecting a building, guarantees to a dealer in brick the financial responsibility of the contractor to whom the brickwork in said building is awarded, the guarantee is that the said contractor will pay for the brick sold to him for use in said building, and not merely that said contractor is a financially responsible person.
2. A corporation which has been granted authority by its charter to erect a building is authorized to make such a guarantee, and where the secretary of the corporation is its acting general manager his signature to such a guarantee binds the company.

*Griswold & White,* for plaintiff.

*Carpenter, Young & Stocker, Stearns, Chamberlain & Royan* and *W. H. Boyd,* contra.

BABCOCK, J.

The City Investment Company, before advertising for bids for the construction of their building known as the Swetland, solicited offers by supply men of such material as they wished

to have used in the construction of their building. They solicited of the plaintiff prices for Darlington brick, in large quantities, but to be sold and charged to the contractor when one was engaged. The Cleveland Builders Supply Company made a written proposition, as requested, for the supply of brick; but since they were to sell to an unknown and unengaged contractor to whom the bills for the brick were to be charged, they naturally wanted some security for such sales. Their offer is as follows:

"CLEVELAND, OHIO, July 8, 1910.
"The City Investment Company,
     "Cleveland, Ohio.
"*Gentlemen*:   We hereby propose to furnish for the building of your company on Euclid avenue, this city, 75,000 more or less light gray Darlington brick of a quality and color same as samples submitted to you and marked 'A Grade' (identified by our name and your name written in ink thereon), at a price of seventeen dollars and fifty cents ($17.50) per thousand delivered at the building.

"We also propose to furnish 150,000 more or less, light gray Darlington brick of a quality and color same as samples submitted to you and marked 'B Grade' (identified by our name and your name written in ink thereon), at a price of sixteen dollars ($16.00) per thousand delivered at the building.

"First shipment of the brick to be delivered within two weeks from time notice is given us to ship, and balance of brick to be delivered as fast as needed for the work and so as not to in any way delay same.

"The above brick to be charged and billed to the contractor for the mason work on said building, you guaranteeing the financial responsibility of said mason contractor.

"Very truly yours,
     "THE CLEVELAND BUILDERS SUPPLY CO.,
          by BERT J. GRAHAM,
"Accepted:               "*Mgr. Brick Dept.*
     "THE CITY INVESTMENT CO.,
          by R. H. SWETLAND, *Sec'y.*"

The controversy is as to the meaning of the concluding clause, "you guaranteeing the financial responsibility of said mason contractor." What does this guarantee import?

The plaintiff says defendant guaranteed the collectibility of the bills for brick furnished under this offer. The defendant says

it only guaranteed that the contractor should be a financially responsible person or company, when furnished to the plaintiff to avail himself or themselves of the offer.

The contract was let to the Forest City Construction Company. It was a newly organized corporation, with ten or fifteen thousand dollars capital stock, of which about half had been subscribed. Of this, a controlling number of shares was issued to John Schmeller, who had been theretofore in the mason contracting business, and who furnished the tools of his trade for the stock issued to him. He contributed nothing further to the corporation. The secretary of the company turned over, in payment for his stock, a piece of real estate worth about $5,000, on which was a $3,500 mortgage. A few others bought stock, and paid in cash for the same $1,500. This was all of its assets when the company began business shortly before taking this contract.

During the early part of the year 1910 it made three or four contracts for the building of buildings in the city of Cleveland, which contracts were of such magnitude that any one of them involved a responsibility several times larger than the assets of the company. Presumably, there was a prospective profit on each of these contracts, if things came out right in the end. One of the contracts was for the construction of the Henke Building on Lorain avenue, which building collapsed on November 22d of that year, and prostrated the Forest City Construction Company in its fall. This company had, in the early part of the year, taken the contract to build the Henke Building, a concrete construction involving perhaps not less than $100,000. The building collapsed, either by reason of some fatal weakness in its plan of construction, or for failure on the part of the construction company to use proper material or proper workmanship. The company was doubtless insolvent, without knowing it, months before the collapse occurred, since its obligation to properly construct the building made it liable to the owners for all that it had cost them, and much more to clear away the debris, although apparently its claim against the owners of the building was a valuable asset; but I do not place my opinion in this case

on the question of the solvency of the contractor at the time of entering into this contract with the plaintiff for the brick furnished by the plaintiff, for which it filed an attested account.

The guarantee was in this case financial responsibility. Responsibility is the ability to respond; in a word, the ability to pay for the brick as the bills for the same matured in the course of the business. As is said in *Sturgis & Company* v. *Bank of Circleville*, 11 O. S., 168, *et seq.*:

"A guarantee, in its strict legal and commercial sense, is said to be 'an undertaking by one person to be answerable for the payment of some debt or the due performance of some contract or duty by another person, who himself remains liable to pay or perform the same. Originally, the words warranty and guaranty were the same. * * * They are now sometimes used indiscriminately; but in general, warranty is applied to a contract as to the title, quality or quantity of a thing sold; and guaranty is held to be the contract by which one person is bound to another for the fulfillment of a promise or engagement of a third party.' Each is, alike, an undertaking by one party to another to indemnify or make good the party assured against some possible default or defect, in the contemplation of the parties. A guaranty is, perhaps, always understood, in its strict legal and commercial sense, as a collateral warranty, and often as a conditional one, against some default or event in the future. The term warranty, on the other hand, is generally understood as an absolute undertaking *in presenti*, as well as *in futuro*, against the defect, or for the quantity or quality contemplated by the parties in the subject-matter of the contract."

Was this a warranty of the financial quality of the contractor who was to be given the privilege of accepting this offer for the brick? Or was it a guaranty of the due performance of the contract about to be entered upon by the contractor?

The court is cited to many cases where the rules of interpretation are given. These are to be resorted to as aids in determining the meaning of the contract when its meaning is doubtful.

Defendant calls attention to the case of *Sweitzer* v. *Baker*, 95 Cal., 539, where the court announces the rule that: "An agreement to pay the debt of another can not be inferred from doubtful language which, although it might be capable of being construed as a guaranty, does not exclude an inference, equally

reasonable, that it was only intended to express confidence in the financial ability and integrity of the debtor."

And in the case of *Kenneweg Company* v. *Finney*, 98 Md., 114, in which a third party, in a letter urging a broker to close with a seller of garden produce, used the following language:

"We are very much interested in seeing that you get the goods, and from the position we occupy, we would say that the contract is good, and that we will look after the same, both to your interest and for our own."

In neither case was the language used held to constitute a legal obligation. In the latter case the court says:

"If the plaintiff required or accepted a guaranty, it was certainly very easily satisfied if it accepted, as it did without comment or objection, language which amounts to nothing more than the mere expression of opinion."

The question in those cases was, whether there was any guaranty. The question here is one as to the extent of a guaranty which was clearly made. The construction company paid for the brick as long and as far as it could; and when it could no longer pay its bills which matured on thirty days credit, according to the custom of trade, the guarantor became liable on its guaranty for the default of the principal debtor. The Builders Supply Company was asked to agree to sell at a given price to an unknown and as yet unemployed contractor, the choice of whom lay with the investment company. The plaintiff, in making the offer, would naturally require of the one choosing the contractor some guaranty of his solvency, or promise to stand behind him in making the purchase. The parties might have selected plainer words to express their meaning, but the intention of the parties must control. The investment company, in effect, said, "We will guarantee his financial responsibility when we choose from among the bidders, but you are pledged to furnish the brick at the price stated in your offer, for it is with reference to it that the bids will be made." If, after the construction company had bound itself to the defendant, the plaintiff had sought to advance the price, or for any reason had declined to furnish the brick, claiming the contracting com-

pany. was not satisfactory to them financially, the investment company would have said, with unanswerable force, "We stand behind. them with the guaranty which we made you in accepting your offer to furnish the brick." To say the guaranty was at an end before the time arrived for the mason contractor to respond to the demand for payment, is to make it a warranty of the contractor's qualifications, rather than a guaranty of future performance, which is the usual office of a guaranty and particularly fitting this situation.

What is the meaning of responsibility? Webster defines it as "the state of being accountable or answerable as for a debt or obligation. It is the ability to answer in payment." The parties must have anticipated the test of the thing guaranteed as arising when the time came to pay for brick furnished under the contract as provided for. Any other holding would be so technical as to defeat the manifest intention of the parties.

Was this guaranty within the implied or incidental power of the corporation?

Section 91 of Machen's Modern Law of Corporations:

"The power to guarantee performance of contracts by customers of the company may often be found convenient in practice to exercise. It is not a power easily implied, and yet to insert, as one of the company's objects, acting as surety for other persons, would be very hazardous, and might, moreover, subject the corporation to burdensome regulations applicable to surety companies. Moreover in some cases the power is implied as incidental. We have seen above that any corporation owning a bill of exchange or promissory note or coupon bond, and desiring to assign the same, may, by endorsement or otherwise, guarantee payment. So it has been held that a company engaged in manufacturing and selling lumber may become surety on the bond of a contractor, to whom it furnishes building material, who is required to give bond to secure performance of a contract. Similarly, a brewing company may go surety for a publican on a bond necessary to secure him a license to sell surety's liquors. It has often been held that a manufacturing company may lend its credit to a debtor who is in embarrassed circumstances—a decision which certainly goes to the extreme limit of the law. It has also been held that a company, when purchasing property, has implied power, as part of the consideration, to endorse or

guarantee notes of the vendor. But this decision overlooks the fact that the objection to guarantees by corporations does not lie merely in the fact that the company receives no benefit, but also in the fact that a corporation has no implied power to speculate upon the ability or inability of a third person to meet his obligations. It has been held that a company which has power to purchase shares in another corporation may, as part of the consideration for the purchase, agree to guarantee dividends on other stock of the second corporation, a decision which is likewise rather questionable. Of course, where the corporation is in fact the principal debtor, there is no legal objection to the execution of commercial paper whereby the company appears in form as a conditional endorser."

*Humbolt Mining Company* v. *American Mfg. Company,* 62 Fed., 360, is authority for denying the power to a selling corporation to guarantee the buyer's contracts involving the use of the material sold.

*Wheeler* v. *Everett Land Company,* 14 Wash., 639, is to the contrary, it appearing in that case that it was customary for such corporations to enter into such contracts in order to get business.

To the same effect is *Central Lumber Company* v. *Kelter,* 201 Ill., 503.

In *Mercantile Trust Co.* v. *Kiser,* 91 Ga., 636, it was held, that where it is essential to the successful prosecution of its business, by a large saw-mill corporation, that a short line of railway, penetrating the country from which its supply of timber must be drawn, should be constructed and operated, and this enterprise is undertaken by a railway corporation, which issues bonds for the purpose of raising funds with which to construct the railway, the interest on these bonds may, before they are negotiated, be guaranteed by the saw-mill corporation.

*Holmes* v. *Willard,* 125 N. Y., 81, upholds the doctrine that a manufacturing corporation, needing goods for its business, may, as a proper incident to its business, extend financial aid to a manufacturer by advancing him money to enable him to furnish the goods; and that this aid may be extended by a loan of its own money or it may take his notes, and, by its credit, raise money thereon, and advance such money, looking for re-

imbursement out of the goods to be manufactured and delivered to it.

In *Low* v. *The California Pacific Railway Co.*, 52 Cal., 53, at 59, the court said:

"Had a natural person taken this lease and made the contract of guaranty now before us there is no room to doubt but it would be held valid; and this being so, the exercise of the power by the corporation must be upheld, unless, by its very nature, it is a power which a corporation can not exercise.    There is no. sufficient reason deducible from the character of such corporation and the business in which it engages, why the corporation can not, for a valid consideration, guarantee the payment of a debt which it may directly contract to pay—why the corporation may not, upon a sufficient consideration, make a conditional as well as an absolute promise of payment."

In *People* v. *Chicago Gas, etc., Co.*, 130 Ill., 268, an incidental power of a corporation is said to be "one that is directly and immediately proper to the execution of the specific power granted, and not one that has a slight or remote relation to it."

This is a succinct statement of the rule, and, when applied to the present situation, I am of opinion the power attempted to be exercised by this defendant was proper to the execution of the specific power granted by its charter, which was the construction of the building to which this material was to be appropriated.

From the above citations it is plain that many of the cases would deny the power of the plaintiff in this case to have guaranteed the construction company's contract as an inducement to the purchase of their goods.    It is another question whether the investment company might not guarantee the payment of the material man's goods which were to go into its building, when it could, without question, have directly purchased them and employed them in the construction of its building by the contractor.    In providing for the offer which was to be available to a contractor when secured, the defendant was serving its own ends.    It desired certain materials for its building.    It naturally wished for low bids; and, to insure contractors prices which would be stable, it got from the plaintiff the offer for the benefit

of the contractor, and with reference to which he was invited to make his bid. It served its own ends, and in doing so, it was carrying out the very purpose of its creation. If it could have purchased the brick and had the walls built by days work, why not by contract? And if it could purchase the brick, why, with the funds in its hands to secure itself against the risk of its guaranty, might it not do indirectly that which it could do directly?

I think there can be no doubt but what this guaranty was within the power of the corporation.

It is urged that the secretary could not bind the corporation by the guaranty.

It is not within the usual duties of the secretary of a corporation to make contracts in its behalf; and, in order to establish such authority, express or implied, some affirmative evidence is necessary.

It appears in proof that the secretary was one of the members of the board of directors, and T. M. Swetland, father of the secretary, was the general manager. He was an elderly man, and was absent from the country in search of health most of the time the building was being constructed. Fred L. Swetland, brother of the secretary, was vice-president and treasurer. The secretary and treasurer, both members of the board of directors, had entire charge of the business of erecting the building. The minutes of the corporation are silent as to the manner of conducting the business. The secretary, with the consent of the board of directors, made and signed for the corporation nearly all of the building contracts, amounting substantially to a quarter of a million dollars. The secretary, with his brothers, superintended the entire work of construction, and performed the duties of the general manager, with his acquiescence and with the full assent of the board of directors, except the signing of checks for the payment of bills, which was done by the president of the corporation, who gave no further attention to it than to sign checks made out and brought to him for his signature by the two Swetlands acting in the place of the general manager.

To deny the authority of the secretary to make the guaranty in question, would enable a corporation to impose on the busi-

ness public, availing itself of those engagements made by him which were for its benefit, and avoiding those which entailed loss upon it. The general manager or managing officer of the corporation has power, *prima facie*, to do any act which the directors could authorize or ratify, and to perform generally anything in the ordinary course of the business. His duties were performed by the secretary of the corporation, by the express authority of the board of directors, and it seems to have ratified, in every instance, everything that he did on its behalf.

It therefore follows that the defendant is indebted to the plaintiff on its guaranty, for the unpaid bills of the construction company to this plaintiff for brick furnished it, in the sum of $5,428.50.